Patricia A. EDWARDS,
Plaintiff–Appellant,

v.

Louis W. SULLIVAN, as U.S. Secretary of Health and Human Services, United States of America, Defendant–Appellee.

No. 90–8001.

United States Court of Appeals,
Eleventh Circuit.

Aug. 5, 1991.

Arthur Frank Millard, Atlanta, Ga., for plaintiff-appellant.

Robert L. Barr, U.S. Atty., Nina Hickson Perry, Asst. U.S. Atty., Bruce R. Granger, Mary Ann Sloan, Scott C. Briles, Mack A. Davis, Holly A. Grimes and Christine Bradfield, Office of Gen. Counsel, Dept. HHS, Atlanta, Ga., for defendants-appellees.

Before ANDERSON and DUBINA, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

Patricia Edwards appeals the district court's [1] order affirming the denial of her application for disability insurance benefits. We affirm the district court's order.

## I. BACKGROUND

Edwards was born in May 1947 and is a high school graduate. In 1969 she began working for Delta Airlines, first as a teletype operator and then as a reservation agent. Sometime in 1973, she severely injured her back when she fell out of her chair at work. Some of her discs were fused, and she stopped working until 1979; from 1974 to 1977 she received disability insurance benefits.

In May 1979, Edwards returned to work at a travel agency; she continued working on a somewhat regular basis for a variety of employers in the travel industry. Her most recent employer was United Airlines, for whom she began working as a reservation agent in January 1984. On April 8, 1986, while still employed with United, Edwards again injured her back; this time the injury occurred while she was attempting

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The Honorable Orinda D. Evans, U.S. District Judge for the Northern District of Georgia.

to lift some equipment at work. She stopped going to work on April 10; Edwards tried to return to work on May 8 but was terminated by United.

Edwards filed for disability insurance benefits on October 10, but her request was denied. She requested a hearing, which was held on August 24, 1987. Edwards appeared without counsel. In addition to her own testimony, she offered reports and letters from Doctors Johnson, Edwards,[2] and Cabot. None of the doctors testified at the hearing.

Doctor Johnson is a psychiatrist; he first treated Edwards for severe depression in December 1985. In a two-page letter dated November 18, 1986, he diagnosed Edwards as suffering from "Axis I Dysthymic Disorder, severe; Axis II Personality Disorder with mixed compulsive, dependent and avoidant features." He also opined that "[a]pparently a combination of orthopedic and emotional problems are contributing to her inability to work."

After the claimant re-injured her back in April 1986, Doctor Johnson referred her to Doctor Edwards, who initially diagnosed the claimant as suffering from a mild acute lumbar strain. A CT scan was performed, and Doctor Edwards' notes indicated that the claimant suffered from pain and would undoubtedly require further treatment, but the prognosis was good and she was likely to improve. Doctor Edwards also indicated that she could return to work; though he initially indicated that she could work only four hours a day, he did not explain why this limitation was imposed. Doctor Edwards later indicated that it would be "appropriate" for the claimant to return to work on a trial basis and that she would not suffer any permanent harm. Beginning in June 1986, Doctor Edwards' notes make several references to Claimant Edwards' legal problems and candidly concede that the doctor and the patient were having problems objectively judging her condition.

Edwards saw Doctor Cabot in connection with a workers' compensation claim relating to the April 1986 injury. Doctor Cabot recommended that a myelogram be performed and prescribed a conservative treatment program. Tests indicated that Edwards had a less than full range of motion; however, Doctor Cabot concluded that Edwards could work so long as she was allowed to get up and walk five minutes of every half hour.

At the hearing, Edwards testified that she could not work because of muscle spasms and pain in her lower back and neck and instability in her right leg. She testified that bending increased the pain and that she had to take two or three hot baths a day to alleviate the pain. She also stated that she made occasional trips to the supermarket, fixed meals, and performed light household chores, such as washing dishes.

At the conclusion of Edwards' testimony, the ALJ determined that he needed more information and ordered consultative orthopedic and psychological examinations. The orthopedic examination was performed by Doctor Hajosey. He determined that Edwards did suffer from decreased sensation and reflex in her right leg and ankle, but he could not determine whether this was a result of her disc fusion; furthermore, there was insufficient evidence for him to determine whether she suffered from a herniated disc. Based upon his examination, Doctor Hajosey concluded that Edwards could sit, stand, and walk, and that she could engage in each activity for up to four hours per day.

The consulting psychiatric evaluation was performed by Doctor Brooks. After administering a series of tests and conducting a personal interview, Doctor Brooks concluded that Edwards exhibited indicia of "social withdrawal, limited friendships, family problems both past and continuing, unmet needs regarding affection, denial of problems, emotional repression, and depression." Doctor Best–Williams, in her capacity of "medical advisor to the administrative law judge," reviewed the evidence "pertaining to the claimant's evaluation and treatment for emotional problems," but she did not personally see the claimant.

---

2. There is apparently no relationship between Doctor Edwards and the claimant.

Based on her review of the records, Doctor Best–Williams concluded that Edwards suffered from a dysthymic disorder with symptoms of depression and that this impairment moderately affected Edwards' ability to function socially. However, her daily activities were "only slightly negatively impacted by her [mental] impairment." She also concluded that Edwards' IQ scores and interview responses reflected that Edwards could think and reason, and that her limitations were due to her physical health. However, after comparing the psychological reports of Doctors Brooks and Johnson, Doctor Best–Williams concluded that Edwards' "limitations seemed to have improved." Finally, in completing an assessment of Edwards' capacity to perform a variety of work-related functions, Doctor Best–Williams indicated that Edwards was not significantly limited in any way, except for her ability to concentrate, which was moderately limited on an episodic basis.

The consulting doctors' reports were received into evidence at a supplemental hearing held by the ALJ. At that time, Edwards testified again; she stated that her back had deteriorated further and that her right leg was "getting worse." A vocational expert ("VE") also testified at the supplemental hearing and responded to three hypothetical questions posed by the ALJ. In the first hypothetical, the VE was asked to assume that Edwards' capabilities were restricted as described in the reports of Doctors Cabot and Best–Williams. The second hypothetical required the VE to consider the limitations described in the reports of Doctors Hajosey and Best–Williams. The final hypothetical included only Claimant Edwards' testimony. In response to the first two hypotheticals, the VE identified a variety of occupations with duties that Edwards could perform; however, if full credit were given to Edwards' testimony, there were no jobs in the national economy she could perform.

The ALJ found that, though Edwards suffered from a chronic lumbar strain, a mild to moderate dysthymic disorder, and a mild to moderate personality disorder, her condition did not meet any of the listed impairments entitling her to disability payments. He further found that her testimony regarding the degree of pain was not fully credible and that, despite her condition, she could perform jobs that exist in significant numbers in the national economy. Consequently, he denied Edwards' request for benefits.

## II. DISCUSSION

Edwards raises a variety of arguments in an attempt to demonstrate that the ALJ's decision was improper. These arguments fall into three main categories: the ALJ's findings regarding her physical condition, the ALJ's findings regarding her mental condition, and denial of counsel. For ease of discussion, we will group her arguments into these three categories and conduct our analysis within that framework.

### A. The ALJ's Findings Regarding Edwards' Physical Condition

Claimant Edwards argues that the ALJ erred in not accepting Doctor Edwards' professional assessment that she should be restricted to part-time hours. This assessment, according to the claimant, was not opposed by any of the other doctors involved in the case and, in any event, could not have been rebutted by the opinions of consulting doctors because Doctor Edwards was her treating physician.

 It is true that the opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis. *E.g., Broughton v. Heckler*, 776 F.2d 960, 961–62 (11th Cir.1985) (per curiam). Here, however, good cause did exist to justify the ALJ's decision not to rely on Doctor Edwards' findings. First, Doctor Edwards' statement that Claimant Edwards was "restricted to a four (4) hour work day" contains no clinical data or information to support his opinion. The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir.1987). Second, approximately one week after "limit-

ing" Claimant Edwards to four hours of work per day, Doctor Edwards' clinical notes indicate that he thought it "appropriate" that she return to work; however, these same clinical notes do not impose or suggest any limitation on the number of hours she could work. This casts doubt on Claimant Edwards' need to be limited to part-time hours; either such a limitation was not medically required in the first instance, or her condition (or Doctor Edwards' assessment of her condition) changed. Finally, approximately one week prior to suggesting part-time hours, Doctor Edwards candidly conceded that he was not sure that he could objectively assess Claimant Edwards' condition. If a treating physician is unsure of the accuracy of his findings and statements, there is certainly no legal obligation for the ALJ to defer to the treating physician's report.

■ Edwards next complains that the ALJ should have accepted her testimony about her pain because she had a good work history. However, Congress has set forth the conditions under which a claimant's complaints of pain may establish the existence of a disability. 42 U.S.C. § 423(d)(5)(A). This court has previously examined this section and ruled that a claimant must produce "evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir.1986). Edwards has met the first requirement by producing evidence of an underlying medical condition. However, the ALJ determined that there were no "clinical findings indicative of a back impairment of the degree of severity described by [Edwards]." Having reviewed the record as *Landry* requires, we hold that substantial evidence

supports the ALJ's conclusion. *Id.* at 1553.[3] Consequently, Edwards has failed to meet either of the two conditions that would satisfy the second part of this test, and the ALJ was thus not required to grant Edwards benefits based on her complaints of pain.

■ Edwards also contends that the Secretary's prior finding of disability (from 1974 to 1977) is binding on the Secretary in the current application for benefits. The simple answer to this argument is that, from 1979 until 1985, Edwards was employed and earned income in excess of the earning guidelines used to determine whether an individual has engaged in substantial gainful activity. 20 C.F.R. § 404.1574(b)(2) (1986). Her ability to engage in substantial gainful activity meant that her prior disability had ceased, and thus is not binding on the Secretary in this second application for benefits.

### B. The ALJ's Findings Regarding Edwards' Mental Condition

■ Edwards argues that the ALJ improperly relied on Doctor Best–Williams' report instead of on Doctor Johnson's report. She correctly points out that the report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence. *See, e.g., Spencer on behalf of Spencer v. Heckler*, 765 F.2d 1090, 1093–94 (11th Cir.1985) (per curiam). At oral argument, the Secretary concedes that if Doctor Best–Williams' report is significantly different from either Doctor Johnson's or Doctor Brooks' reports, then the case must be remanded. Our task, then, is to compare the three reports and determine whether Doctor Best–Williams' report disagrees with the other two.

Doctor Johnson's report consists of two pages. He diagnosed Edwards as suffer-

---

**3.** "Substantial evidence is more than a scintilla. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986). Under this standard, we do not reverse the Secretary even if this court, sitting as a finder of fact, would have reached a contrary result; "[e]ven if we find that the evidence preponderates against the secretary's decision, we must affirm if the decision is supported by substantial evidence." *Id.*

ing from "Axis I Dysthymic Disorder, severe [and] Axis II Personality Disorder with mixed compulsive, dependent and avoidant features." In describing Edwards' limitations, Doctor Johnson indicated that she was "found by her employer to be unable to carry out her duties, and there is some question about whether her back problem is a work-related injury. Apparently a combination of orthopedic and emotional problems are contributing to her inability to work." It is not clear whether Doctor Johnson means that Edwards is unable to work at any job, or whether she was merely unable to continue with her prior employer. Significantly, Doctor Johnson's report does not indicate what limitations might be expected due to the conditions he diagnosed.

Doctor Brooks, whose findings were described above, concluded that Edwards' "impairment for work-related circumstances appear[ed] to be at a moderate to severe level primarily related to [Edwards'] ... level of depression, stress, major [sic] family problems." However, Doctor Brooks also indicated that "[i]f employment were possible which would allow her a flexible routine for some standing and moving around at work, she would benefit greatly from some time away from her home situation." From this, we conclude that Doctor Brooks did not mean to imply that Edwards could not work; had this been her meaning, she would not have suggested working as a means of "treatment."

Doctor Brooks also indicated that Edwards could not "operate in a routine work setting unless flexible to allow for periodic movement" and that initial part-time hours would be required. Significantly, Doctor Brooks did not explain why Edwards needed this freedom to move, nor did she indicate in general terms whether this freedom was mandated by Edwards' physical or mental condition. It is entirely probable, given the context of the case and the nature of Edwards' ailments, that Doctor Brooks included this limitation due to Edwards' physical complaints. Ultimately, the report is not clear in this regard.

Doctor Best–Williams' report recognizes that Edwards suffers from a dysthymic disorder and depression and accurately reflects the results of the tests administered by Doctor Brooks. Most importantly, Doctor Best–Williams provided an interpretation of Edwards' condition vis-a-vis the limitations those conditions placed on Edwards' abilities. Because this information was not contained in either Doctor Johnson's or Doctor Brooks' reports, we cannot say that Doctor Best–Williams contradicted their findings. Consequently, the ALJ did not err in relying on her report.

### C. Denial of Counsel

Edwards contends that her due process rights were violated because her right to counsel was denied. The Secretary points out that Edwards was told of her right to counsel on several occasions, and on each she declined to be represented. Specifically, the Secretary points out that prior to the August 24 hearing, Edwards received a letter informing her of the right to representation and to submit evidence. This letter was accompanied by a list of attorneys and organizations that might help her. At the August 24 hearing, Edwards responded to the ALJ's questions about counsel by stating that she "didn't want any representation." On that same day, Edwards signed a statement indicating that she was aware of her rights to representation and that she had been informed of attorneys and agencies that might be available to represent her. At the December 14 hearing, Edwards again told the ALJ that she wanted to represent herself, and she signed another copy of the statement she had signed on August 24.

 The problem with these disclosures is that none of them informed Edwards that any fee awarded would be limited to 25% of her benefits. 42 U.S.C. § 406(b)(1). In fact, the letter Edwards received prior to the August 24 hearing contains less information than letters we have found wanting in the past. *See Benson v. Schweiker,* 652 F.2d 406, 408 (5th Cir. Unit B July 1981); *see also Clark v. Schweiker,* 652 F.2d 399, 403 (5th Cir. Unit B July 1981)

**586**

(notice lacked "very important information that in no event could such a fee exceed 25% of the recovery for [the] amount due up to the date of the award.").[4] Because the notice was flawed, any purported waiver was ineffective. *Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir.1982).

■ Finding a flaw in the notice, however, does not automatically require the case be remanded. We must examine the record to determine whether Edwards was prejudiced by her lack of representation. *Id.* In examining the record, "[w]e are concerned not so much with whether every question was asked which might have been asked had [Edwards] been represented by an attorney, as we are with whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.' " *Id.* at 830 (quoting *Ware v. Schweiker*, 651 F.2d 408, 413 (5th Cir. Unit A July 1981), *cert. denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982)). We discern no evidentiary gaps in the record before us. Every doctor who examined Edwards submitted a report, and the ALJ procured reports from three consulting doctors in order to aid his understanding of those reports which, as we have indicated, were not entirely clear as to Edwards' limitations. Though Edwards disagrees with the ALJ's conclusions, the fact remains that those conclusions were supported by substantial evidence, and Edwards does not indicate what facts could have been submitted by an attorney that would have changed the outcome. Consequently, Edwards was not prejudiced by her failure to be represented at the hearings. *Cf. McConnell v. Schweiker*, 655 F.2d 604, 606 (5th Cir. Unit B Sept. 1981).[5]

## III. CONCLUSION

The Secretary's decision is based upon substantial evidence appearing in the record as a whole. Although Edwards'

---

**4.** The Eleventh Circuit has adopted the former-Fifth Circuit's decisions as binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

**5.** We do not understand why, nearly a decade after *Clark, Benson,* and *Smith* were decided,

was not adequately informed of her right to counsel, she was not prejudiced by this imperfection. We have considered Edwards' remaining arguments and conclude they lack merit. Consequently, we AFFIRM the district court.

the Secretary still has not formulated an adequate notice. We would prefer that the Secretary send claimants a proper notice in the first place instead of arguing that no prejudice occurred despite the lack of proper notice.